IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HAMPTON HARRIS, Individually, and as §
as Independent Administrator of the Estate §
of MICHAEL HARRIS, Deceased; and §
ANDREW MUSGROVE, Individually and §
as Independent Administrator of the Estate §
of ANNE HARRIS, §
        §
    Plaintiffs, §    CASE NO.:  4:09-CV-3155
        §    TRIAL BY JURY REQUESTED
       v. §    HUGHES, D.J.
        §
SOCIETE AIR FRANCE, AIRBUS S.A.S., §
HONEYWELL INTERNATIONAL, INC., §
ROCKWELL COLLINS, INC., and §
THALES, S.A., §
        §
    Defendants. §

## AIRBUS S.A.S.'S ORIGINAL CROSSCLAIM

Pursuant to Federal Rule of Civil Procedure 13(g), Defendant and Cross-Plaintiff AIRBUS S.A.S. files this Crossclaim against Defendant and Cross-Defendant Société Air France.  Airbus S.A.S. brings this Crossclaim in accordance with the requirements of Rule 13 and Rule 15(a)(1) and to protect its rights under the Rules and does not, by filing this Crossclaim, concede or agree that this is a convenient or appropriate forum for resolving these or any other claims arising from the facts set forth below.  Subject to and without waiving its rights, privileges, and defenses, including but not limited to forum non conveniens, Airbus S.A.S. would show as follows:

### JURISDICTION AND VENUE

1.      Cross-Plaintiff Airbus S.A.S. ("Airbus") is a *société par action simplifiée* organized under the laws of France with its principal place of business in Toulouse-Blagnac, France.

2.      Cross-Defendant Société Air France ("Air France") is a foreign corporation organized under the laws of France with its principal place of business in Tremblay-en-France, France.  Air France has generally appeared in this action and is subject to the jurisdiction of this Court.

3.      This Court has supplemental jurisdiction over this Crossclaim pursuant to 28 U.S.C. § 1367(a) because this Court has original jurisdiction over the initial complaint pursuant to 28 U.S.C. § 1369.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Cross-Defendant Air France is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

5.      On June 1, 2009, Air France operated as a common carrier.

6.      Air France Flight 447 ("AF 447") was a scheduled commercial flight operated by Air France that departed from Rio de Janeiro-Galeão International Airport, Brazil on May 31, 2009, bound for Paris-Charles de Gaulle Airport, France, aboard an Airbus A330-203 aircraft bearing registration No. F-GZCP (the "Aircraft").  Shortly after 2:15 a.m. on June 1, 2009, AF 447 crashed into the Atlantic Ocean, approximately 650 miles off the coast of Brazil (the "Accident").

7.      At all times material to this litigation, Air France owned, operated, and controlled the Aircraft and was solely responsible for operating, maintaining, repairing, inspecting, and servicing the Aircraft and its component parts.

8.      At all times material to this litigation, Air France was solely responsible for hiring, training, supervising, and controlling its employees, agents, contractors, and other representatives responsible for the safe conduct of flight operations, including Air France's flight, cabin, and maintenance crews, and the pilots in command of the Aircraft on June 1, 2009 (the "flight crew").

9.      Prior to takeoff from Rio de Janeiro-Galeão International Airport, Air France knew that AF 447's intended flight path would carry it through the Inter-Tropical Convergence Zone, a geographical area of the Atlantic Ocean near the Equator where winds originating in the northern and southern hemispheres come together.  Because of its location, the Inter-Tropical Convergence Zone is prone to severe convective weather systems, including intense thunderstorms.

10.     Cumulonimbus clusters of the type encountered in the Inter-Tropical Convergence Zone typically feature significant turbulence and electrical activity.  Supercooled water and ice crystals are also often present in the upper reaches of such clusters, including at or above 35,000 feet, AF 447's intended cruise altitude.  These facts were known to Air France prior to AF 447's departure on June 1, 2009.

11.     Radar images available prior to AF 447's departure on June 1, 2009 revealed that powerful cumulonimbus clusters characteristic of the Inter-Tropical Convergence Zone were present on that night.  Special weather advisories ("SIGMET," or "Significant Meteorological Information") were issued during the evening of May 31, 2009 for pilots flying through areas along AF 447's intended flight path.  These SIGMETs warned pilots of the presence of numerous convective storms in the Inter-Tropical Convergence Zone on that evening, including stationary storms with tops reaching as high as 40,000 feet.

12.     The Aircraft was also equipped with weather radar capable of detecting such cumulonimbus clusters.  By using the weather radar on board the Aircraft, the storms along AF 447's intended flight path could have been detected and avoided.

13.     As demonstrated by the actions of pilots on other flights in the vicinity of AF 447's intended flight path, it was both advisable and feasible to alter course and divert around the stationary cumulonimbus clusters shown on the pre-flight radar images, in the SIGMETs issued on May 31, 2009, and visible on the Aircraft's weather radar.

3

14.     At least three commercial airliners flying similar flight paths to AF 447's on the same night diverted around the cumulonimbus clusters and proceeded safely to their destinations:

(a)     Iberia Airlines Flight IB6024 ("Flight IB6024"), an Airbus A340 en route from en route from Rio de Janeiro-Galeão International Airport to Madrid, Spain, encountered severe weather conditions before reaching the TASIL waypoint (a reference point over the Atlantic Ocean approximately 200 kilometers from AF 447's last known position). The Flight IB6024 flight crew chose to divert approximately 30 nautical miles east to avoid cumulonimbus clusters shown on their aircraft weather radar. Flight IB6024 then returned to its intended flight path in clear skies close to the TASIL waypoint.

(b)     Air France Flight 459 ("AF 459"), an Airbus A330-203 en route from São Paulo-Guarulhos Airport to Paris-Charles de Gaulle, detected a significant squall line on its aircraft weather radar with an estimated length of 150 nautical miles. The AF 459 flight crew chose to divert approximately 70 to 80 nautical miles east of its intended flight path, and returned to its flight path near the ASEBA waypoint.

(c)     Lufthansa Flight LH507 ("Flight LH507"), a Boeing 747-400 en route from São Paulo-Guarulhos Airport to Frankfurt, Germany, detected cumulonimbus clusters on its aircraft weather radar while passing the ORARO waypoint. The Flight LH507 flight crew chose to divert approximately 10 nautical miles west of its intended flight path, and encountered only moderate turbulence.

15.     Pre-departure radar images and SIGMETs that clearly indicated the presence of significant cumulonimbus clusters in the Inter-Tropical Convergence Zone (as well as onboard weather radar capable of detecting such clusters) prompted other commercial airliners on or near the same route to divert from their original flight paths. Available evidence from the official French investigation – cited by Plaintiffs in their Complaint – indicates that Air France's dispatch services did not divert the AF 447 flight from the planned route, and "[u]p to the last

4

position report point, transmitted automatically via the ACARS message, the AF447 [pilots] had not deviated from the planned route by more than 1 nautical mile[.]"

16.     Among the dangers to safe flight posed by high-altitude flight through cumulonimbus clusters are the presence of supercooled water droplets and ice crystals. Supercooled water droplets and ice crystals can damage various aircraft components. Although ice crystals cannot be detected by radar, it is known to flight crews that they are often found above cumulonimbus clusters like the ones present in the Inter-Tropical Convergence Zone on the night of the Accident. For these reasons, pilots are trained to consult their onboard weather radar and other available meteorological data to recognize and avoid such systems.

17.     Instruments attached to the aircraft's fuselage collect air pressure information for use by the air data inertial reference unit ("ADIRU") to derive standard altitude and airspeed. Multiple systems on the A330 rely on these altitude and airspeed data to carry out their respective functions.

18.     As Air France was aware on June 1, 2009, all airspeed detection systems are inherently subject to temporary obstructions from adverse weather conditions. Transient weather phenomena, including supercooled water droplets and ice crystals of the sort encountered in high-altitude convective systems, can temporarily degrade the aircraft's ability to measure airspeed accurately.

19.     As of June 1, 2009, the Aircraft, including its relevant component parts, met or exceeded the applicable certification standards. Nevertheless, Airbus had introduced new service bulletins for A330 aircraft (including the Aircraft) in 2007. Despite receiving several relevant service bulletins from Airbus in September 2007, Air France failed to retrofit the Aircraft with the latest standards.

20.     Because of the AF 447 pilots' decision to fly through the storms indicated on pre-departure radar images, SIGMETs, and the Aircraft's weather radar, the Aircraft may have

been exposed to cumulonimbus clusters and associated adverse weather conditions, including significant turbulence and the presence of supercooled water droplets and ice crystals, some of which could lead to temporary—and foreseeable—interruptions in the Aircraft's ability to measure airspeed accurately.

21.     Although pilots normally rely on airspeed indications derived by the aircraft, pilots are taught to fly an aircraft safely with unreliable airspeed indications in the cockpit. Pilots are trained to detect unreliable airspeed situations when they occur, and to memorize and follow simple procedures that allow the aircraft to maintain correct airspeed and attitude until accurate airspeed indications are regained.   Both the Airbus A330-203 Quick Reference Handbook and Air France's Flight Crew Operating Manual, which are carried with the crew in the cockpit, also provide the procedures for safely managing unreliable speed situations. Because of their importance, the unreliable airspeed procedures in the Airbus A330-203 Quick Reference Handbook are "memory items" that must be learned and memorized by all qualified pilots.

22.     Despite the ready availability of these procedures, and despite the requirement that such procedures be memorized, the Air France pilots failed to apply the appropriate procedures.  As a result, at approximately 2:15 a.m. on June 1, 2009, shortly after entering the area containing the cumulonimbus clusters, the Aircraft crashed into the high seas of the Atlantic Ocean approximately 650 miles off the coast of Brazil.

23.     The pilots' failure to follow the correct unreliable airspeed procedures would have contravened both the Airbus A330-203 Quick Reference Handbook and Air France's own Flight Crew Operating Manual and was a proximate cause of the Accident.

24.     At all times, the Aircraft responded as commanded by the Air France pilots and in accordance with its design.

25.     Air France is a learned-, responsible-, sophisticated-, and/or informed-intermediary and user, as those doctrines are construed under the applicable law.

### FIRST CAUSE OF ACTION:
### <u>CONTRIBUTION</u>

26.     Airbus incorporates by reference every allegation contained in paragraphs 1-25, as if fully set forth here.

27.     Plaintiffs assert in the underlying action that Airbus is liable for their alleged damages as a result of Airbus's alleged negligence and/or as a result of alleged defects in the Aircraft.

28.     Air France contributed to and/or caused the losses for which Plaintiffs seek damages by, among other things:

      (a)    Failing to equip the Aircraft with the latest standards;

      (b)    Failing to properly hire, train, supervise, and control its employees, agents, contractors, and representatives responsible for the safe conduct of flight operations, including pilots, mechanics, contractors, third-party service personnel, flight dispatchers, and others whose careful attention is required to insure safety of flight operations;

      (c)    Failing to properly train its flight crews and pilots;

      (d)    Failure of AF 447's dispatch and/or pilots to detect and/or avoid the storm systems indicated on pre-departure radar images, SIGMETs, and the Aircraft's weather radar, thereby jeopardizing the safety of the flight of AF 447;

      (e)    Failure of AF 447's pilots to properly operate the Aircraft following their decision to fly into the storm systems along their intended flight path; and

      (f)    Failure of AF 447's pilots to comply with the Air France Flight Crew Operating Manual procedures and/or Airbus Quick Reference Handbook procedures during the flight of AF 447.

29.     The actions and/or omissions of Air France were the proximate cause of the Accident.

30.     If Airbus is adjudged liable under the applicable law to Plaintiffs for any of their alleged injuries or damages resulting from the Accident, which liability is expressly denied,

Airbus is entitled to contribution, under the applicable law, from Air France for the share of liability that the finder of fact apportions against Air France, and for any amounts paid by or on behalf of Airbus in settlement, judgment, or compromise of Plaintiffs' actions and its fees and expenses incurred in these actions, together with attorneys' fees, costs, interest, and such other relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION:
### <u>INDEMNITY</u>

31.    Airbus incorporates by reference every allegation contained in paragraphs 1-25, as if fully set forth here.

32.    Plaintiffs assert in the underlying action that Airbus is liable for their alleged damages as a result of Airbus's alleged negligence and/or as a result of alleged defects in the Aircraft.

33.    Air France contributed to and/or caused the losses for which Plaintiffs seek damages by, amongst other things:

(a)    Failing to equip the Aircraft with the latest standards;

(b)    Failing to properly hire, train, supervise, and control its employees, agents, contractors, and representatives responsible for the safe conduct of flight operations, including pilots, mechanics, contractors, third-party service personnel, flight dispatchers, and others whose careful attention is required to insure safety of flight operations;

(c)    Failing to properly train its flight crews and pilots;

(d)    Failure of AF 447's dispatch and/or pilots to detect and/or avoid the storm systems indicated on pre-departure radar images, SIGMETs, and the Aircraft's weather radar, thereby jeopardizing the safety of the flight of AF 447;

(e)    Failure of AF 447's pilots to properly operate the Aircraft following their decision to fly into the storm systems along their intended flight path; and

(f)    Failure of AF 447's pilots to comply with the Air France Flight Crew Operating Manual procedures and/or Airbus Quick Reference Handbook procedures during the flight of AF 447.

34.     The actions and/or omissions of Air France were the proximate cause of the Accident.

35.     If Airbus is adjudged liable under the applicable law to Plaintiffs for any of their alleged injuries or damages resulting from the Accident, which liability is expressly denied, Airbus is entitled, under the applicable law, to contractual and/or equitable indemnity from Air France for the share of liability, if any, that the finder of fact apportions against Air France, and for any amounts paid by or on behalf of Airbus in settlement, judgment, or compromise of Plaintiffs' actions and its fees and expenses incurred in these actions, together with attorneys' fees, costs, interest, and such other relief as the Court deems appropriate.

## NOTICE OF THE APPLICABILITY OF THE LAW OF ANOTHER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 44.1, Airbus gives notice that it may raise issues concerning the applicability of the law of another jurisdiction, including but not limited to the law of France, and reserves the right to assert and plead such other claims and defenses available to it arising out of the application of the substantive laws of another jurisdiction.

## REQUEST FOR JURY TRIAL

Airbus demands a trial by jury on all issues so triable.

## CONCLUSION AND PRAYER

WHEREFORE, Airbus S.A.S. respectfully prays that:

(1)     Plaintiffs take nothing, but to the extent the fact-finder awards damages, any award arising from Plaintiffs' claims against Airbus be reduced by that proportion of responsibility adjudged against Air France;

(2)     Airbus be awarded, as contribution, all amounts it pays or are paid on its behalf in settlement, judgment, or compromise of Plaintiffs' actions;

(3)     Airbus be awarded indemnity for any and all liability in connection with Plaintiffs' actions, including any amounts it pays or are paid on its behalf in settlement, judgment, or compromise of such actions;

(4)     Airbus be awarded its costs of Court;

(5)     Airbus be awarded its reasonable and necessary attorneys' fees incurred in the defense and prosecution in these actions; and

(6)     Airbus be awarded such other and further relief to which it shows itself entitled.

Dated: December 29, 2009.

Respectfully submitted,

**HOGAN & HARTSON LLP**

By:   _/s/Thad T. Dameris_
     Thad T. Dameris
     *Attorney-in-Charge*
     State Bar No. 05345700
     Southern District ID No. 7667
     700 Louisiana Street, Suite 4300
     Houston, Texas 77002
     Tel.: (713) 632-1400
     Fax: (713) 583-6297

**COUNSEL FOR AIRBUS S.A.S.**

**Of counsel:**
Bruce D. Oakley
State Bar No. 15156900
Southern District ID No. 11824
Trevor R. Jefferies
State Bar No. 00790963
Southern District ID No. 18143
Christopher M. Odell
State Bar No. 24037205
Southern District ID No. 33677

## CERTIFICATE OF SERVICE

On the 29th day of December 2009, a copy of Airbus S.A.S.'s Original Crossclaim was filed electronically using the Court's Electronic Case Filing System. Notice of this filing will be sent electronically to counsel of record using the Court's electronic notification system. Parties may access this filing through the Court's Electronic Case Filing System.


_____/s/*Thad T. Dameris*_____
Thad T. Dameris